Carl CROSBY *v.* Carmen CROSBY

CA 06-756 249 S.W.3d 144

Court of Appeals of Arkansas
Opinion delivered February 7, 2007

*Worsham Law Firm, P.A.*, by: *Richard E. Worsham*, for appellant.

*John C. Throesch*, for appellee.

JOSEPHINE LINKER HART, Judge. Carl Crosby appeals from a Randolph County Circuit Court order prohibiting his step-sons from having contact with his twin four-year-old daughters when he exercises his visitation with his daughters. On appeal, he argues that the trial court erred in finding that it was in the best interest of the minor children to limit his visitation rights. We affirm.

Carl Crosby and appellee Carmen Crosby divorced on December 27, 2004, and pursuant to a settlement agreement, Carmen was awarded custody of the parties' two children and Carl

received visitation. The two children, As. and Al., are twin girls, born January 25, 2002. Almost immediately, problems with visitation ensued.

Carl remarried in August 2005. His new wife, Jennifer, brought with her two sons, J. and A.[1] In October 2005, As. and Al. allegedly told their maternal grandmother that their new stepbrothers had sexually assaulted them. After this revelation, Carmen restricted Carl's access to the twins, and on November 18, 2005, she filed a petition to modify Carl's visitation. Carl answered, and on December 6, 2005, he filed a motion asking the trial court to find Carmen in contempt for obstructing his visitation.

At the ensuing February 6, 2006 hearing, Stan Rogers, an investigator for the Arkansas State Police Crimes Against Children Division, testified that on October 11, 2005, a complaint was filed on the child-abuse hotline. Acting on the complaint, he conducted separate interviews of As. and Al. Each of the girls stated that while they were staying at their father's house, J. and A. pulled down their pants, touched them on their vaginas, and poked them in their pubic area with a purple stick. They both also stated that their father had spanked the boys "really hard." Rogers believed that the twins' stories were consistent. Rogers also interviewed Carmen and obtained statements from Carmen's mother, Frances Rose, and Dr. Howell Beret, who had examined the girls at Carmen's and Rose's request. After completing his initial inquiry, Rogers passed the information to investigators in Little Rock. Ultimately, however, the case was referred to Sgt. Curtis Wood of the Benton Police Department, who found insufficient evidence to pursue a sexual-abuse case.

Teresa Sain, a licensed clinical social worker for Life Strategies Counseling, testified that she began counseling As. and Al. on December 28, 2005. Sain stated that Carmen had contacted her about counseling the girls because the twins had disclosed that they had been sexually molested by their stepbrothers. Sain further testified that, after she established a rapport with the children in her counseling sessions, the twins made similar disclosures to her. She opined that there was no indication that the girls had been coached

---

[1] No direct evidence of the boys' ages appear in the record, however, we surmise from a question on cross-examination of Stan Rogers that they were eleven and seven years old at the time that of the investigation.

in their statements. Carmen testified that she had taken the twins to Stan Rogers after she had made a complaint through the child-abuse hotline. She stated she was directed to take the girls to Hot Springs for further investigation of the sexual-abuse allegations. Carmen described how As. and Al. were apparently traumatized by the physical examination that they were subjected to at the child advocacy center at St. Joseph's Mercy Hospital. She described how she had to hold the children down and how they screamed and cried during the physical examination. She then noted that the twins were interviewed shortly after their physical exam and that the interviews each lasted less than twenty minutes. Carmen was then approached by Sgt. Wood, who suggested to her that he believed that she had made up the allegations.

Carmen asserted that As. and Al. had been consistent in their allegations of sexual abuse. Carmen stated that prior to the disclosures that the girls had made to Frances Rose, she had noticed significant changes in the girls' behavior. Carmen claimed that she had disciplined the girls for sexually acting out. She also noted that the girls had complained about "their bottoms hurting a lot" after visits at their father's house, which she at first ascribed to problems with toilet training.

On cross-examination she testified that she was aware that Carl had an extramarital affair with his current wife Jennifer. She admitted that she referred to the woman as "a whore and a bitch." However, she denied harboring resentment against her ex-husband for having married his paramour. Carmen stated that she had not allowed Carl to have overnight visits with the twins at his home in Benton since October because that was where the stepchildren resided and she was protecting her children.

Dr. Howell Beret, a retired but still-licensed physician, testified that he examined As. and Al. He insisted on seeing the twins individually. According to Dr. Beret, they each stated that their stepbrothers had been "poking and touching" them. He stated that "this information just flowed out of them." He examined their perineum and did not find any evidence of scratches or abrasions, but he contended that lack of obvious physical findings "did not cause [him] to discount what they were telling [him]." Dr. Beret stated unequivocally that neither the State Police nor the Benton Police Department contacted him directly concerning his findings.

Sgt. Wood testified that he was in charge of the criminal investigation division of the Benton Police Department. Although he conceded that he did not have any special expertise in investigating child sexual-abuse cases, he investigated the allegations after he received a report from the Crimes Against Children Division of the Arkansas State Police. After reviewing the report that he received from the State Police, Wood concluded that the twins needed to be interviewed again because, in his opinion, some of Rogers's questions "could be interpreted as being leading and may have prompted some of the answers."

According to Wood, the boys were interviewed first, but he only observed the interview with the younger boy, J. Wood claimed that he saw "no signs of deception." He also interviewed Carl Crosby, who stated that he was only interested in finding the truth. Wood claimed that he called Dr. Beret from the child advocacy center and spoke to him about his findings that there was no physical evidence suggesting sexual abuse.

Wood stated that neither twin "passed" the portion of the interview where it was sought to establish whether they understood what was true and not true. He also noted that As.'s interview was terminated "early" because she was "moving around." Wood conceded that if he had been conducting the interview, he probably would have taken a break and tried to complete the interview. Wood admitted that he did not believe the girls' stories were credible. He did, however, note that both of the girls told him without being able to provide details that their father was "mean" to their mother.

According to Wood, he also spoke with Carmen and told her that the allegations of sexual abuse could not be substantiated. He found it remarkable that Carmen was not relieved to hear that it would be the disposition of the case. He also recalled that "she could not believe that Carl Crosby would spend time with them, his new wife and her two sons, J. and A., and not with his two daughters."

Lee Ann Vannaman, the supervisor of the Arkansas State Police Crime Against Children Division in Saline and Pulaski Counties, testified that she reviewed the finding that the evidence did not support the allegations and agreed with the finding. She admitted, however, that she "never ran across Sergeant Wood in one of these kind of cases." She also admitted that she never talked to the girls and was relying on Wood's determination that their

story was not credible. Vannaman had known Stan Rogers for "nine or ten years probably"and stated that he had a reputation for doing a good job.

Carl Crosby stated that when the allegations came to light, he and Jennifer "talked to the boys," and after "lengthy discussions" he concluded that "we had nothing to hide." He stated that Carmen had made visitation with his daughters extremely difficult — at one point "unilaterally" halting visitation — and had disparaged him in front of the twins. She also discouraged telephone contact between him and his daughters. Carmen denied that she was being unreasonable in restricting visitation because Carl never agreed to keep the boys away from the twins. She also denied that she made disparaging remarks about him. Carmen did, however, assert that Carl made several "harassing and threatening" phone calls to her. She also conceded that she found Jennifer being around her children "very bothering."

The trial judge stated from the bench that he was "deeply troubled" about how the investigation was conducted. He expressed particular concern about the fact that one child's interview was cut short. The trial judge found that Carmen did not "put this in the children's mind." However, based on what he learned about the investigation, he was "not satisfied" that it was conclusive and stated that it "seems like this investigation was given a short shift." He also specifically found that he did not trust Wood's determination that the accusations were unsubstantiated because other professionals had expressed a different opinion and the interview that Wood sponsored was too incomplete to support his conclusions. The trial judge decided that under these circumstances the best interest of the children dictated that they be protected. He reinstated Carl's visitation according to the court's visitation schedule but ruled that Carl's stepsons were not to be present.

On appeal, Carl argues that the trial court erred in limiting his visitation rights without finding that the allegations of sexual abuse were true. He contends that by not making a "factual ruling" of his own and refusing to accept the findings by a State agency charged with investigating "such matters," the trial court "left the matter in limbo." While he concedes that he was allowed to continue to visit his daughters, he complains that he was prejudiced by the ruling because "he cannot have them as part of his new family since they cannot be around their stepbrothers." He claims that the trial court limited his visitation rights "solely upon the unproven allegation of abuse." Without citation of authority,

Carl asserts that the trial court should have accepted Ms. Vannaman's "professional judgment" that there was not a "preponderance of evidence to support the allegation of sexual abuse," because her "role in the process is similar to that of a judge." We disagree.

Setting visitation rights is a matter that lies within the sound discretion of the trial court. *Hudson v. Kyle*, 365 Ark. 341, 229 S.W.3d 890 (2006). The main consideration in making judicial determinations concerning visitation is the best interest of the child. *Id.* We review traditional equity cases on both factual and legal questions de novo on the record, but we will not reverse a finding by a trial court unless it was clearly erroneous. *Id.* A finding of fact by a trial court sitting in an equity case is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* In resolving the clearly erroneous question, we must give due regard to the opportunity of the trial judge to evaluate the credibility of witnesses, and we give great weight to the trial judge's personal observations because there are no cases in which the superior position, ability, and opportunity of the judge to observe the parties carries a greater weight. *Id.*

In the first place, we cannot subscribe to Carl's major premise that the trial court was obligated to make a conclusive finding as to whether the twins were sexually abused or not. While that would be the job of a trier of fact sitting in a criminal or juvenile court, it was not specifically required in this situation. Here, the trial court was tasked merely with deciding the nature of Carl's visitation. Secondly, the trial court expressly determined that after what it believed to be "partial investigations" there was significant uncertainty as to what, if anything, had actually happened to the girls. Implicit in this finding was a credibility determination that the conclusions of several experienced professionals, who had considerably more contact with the children than Wood, should not be discounted. Given the deference that we give to the trial judge in these situations, we cannot conclude that this finding was clearly erroneous. *See id.* Under these circumstances, we believe that the trial court was justified in ordering that J. and A. not be present when Carl exercised his visitation. It is beyond question that the best interest of the children lies in their not being subject to sexual abuse. Likewise, we do not subscribe to

Carl's assertion that visitation can be altered with impunity. Making a false allegation exposes the perpetrator to prosecution for filing a false police report, and if the perpetrator is a parent, to possibly losing custody of her children.

 Finally, we also reject Carl's argument that the trial court—and this court on review—should just accept Ms. Vannaman's "professional judgment" because her role is similar to that of a judge. Such an approach would not only be repugnant to the doctrine of separation of powers, it would also violate the parties' rights to due process. We have no intention of abdicating our responsibility.

Affirmed.

HEFFLEY and MARSHALL, JJ., agree.